```
IN THE UNITED STATES DISTRICT COURT
  FOR THE NORTHERN DISTRICT OF INDIANA
          SOUTH BEND DIVISION
```

JOHN BOND, SR.,                )
                               )
     Plaintiff,                )
                               )
     v.                        )     No. 3:14-CV-1902
                               )
CITY OF SOUTH BEND,            )
                               )
     Defendant.                )

## OPINION AND ORDER

This matter is before the Court on "Defendant's Motion for Summary Judgment," filed by Defendant, City of South Bend, on September 14, 2015 (DE #50). For the reasons set forth below, this motion (DE #50) is **GRANTED.** The Clerk of the Court is **ORDERED** to **DISMISS** this case **WITH PREJUDICE.**

BACKGROUND

On September 16, 2014, pro se Plaintiff, John Bond ("Bond"), filed an employment discrimination complaint against the named Defendant, City of South Bend ("South Bend"). (DE #1.) Bond alleged that South Bend was liable to him for discrimination based upon his race because he was wrongfully terminated and falsely accused in violation of Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. § 2000e-5.

South Bend filed for summary judgment on September 14, 2015, requesting that the Court enter summary judgment against Bond on all claims raised in the complaint because there are no genuine issues of material fact, and South Bend is entitled to summary judgment as a matter of law. On September 22, 2015, this Court gave Bond notice of the consequences of failing to properly respond to the summary judgment motion pursuant to *Timms v. Frank,* 953 F.2d 281, 285-86 (7th Cir. 1992). (DE #52.) The notice also advised Bond that his response was due on or before October 20, 2015. *Id.* Bond filed his response to the motion for summary judgment on October 21, 2015. (DE #54.) Bond's response is a 28-page document that is narrative in form. On November 2, 2015, South Bend filed its reply to Bond's response to the motion for summary judgment arguing that Bond failed to demonstrate a genuine dispute as to any material fact. (DE #55.) Having been fully briefed, the motion is ripe for adjudication.

DISCUSSION

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct.

2505, 91 L.Ed.2d 202 (1986). Not every dispute between the parties makes summary judgment inappropriate; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* In determining whether summary judgment is appropriate, the deciding court must construe all facts in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Ogden v. Atterholt,* 606 F.3d 355, 358 (7th Cir. 2010). "However, our favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture." *Fitzgerald v. Santoro,* 707 F.3d 725, 730 (7th Cir.2013) (citing *Harper v. C.R. Eng., Inc.,* 687 F.3d 297, 306 (7th Cir.2012)).

A party opposing a properly supported summary judgment motion may not rely on allegations or denials in his own pleading, but rather must "marshal and present the court with the evidence [he] contends will prove her case." *Goodman v. Nat'l Sec. Agency, Inc.,* 621 F.3d 651, 654 (7th Cir. 2010). If the nonmoving party fails to establish the existence of an essential element on which he or she bears the burden of proof at trial, summary judgment is proper. *Massey v. Johnson,* 457 F.3d 711, 716 (7th Cir. 2006).

While the initial burden of production "to inform the district court why a trial is not necessary" lies with the movant, the requirements imposed on the moving party "are not onerous" when it

3

is the nonmovant who "bears the ultimate burden of persuasion on a particular issue." *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013). A party may move for summary judgment based on either "affirmative evidence that negates an essential element of the nonmoving party's claim" or by the other approach of "asserting that the nonmoving party's evidence [was] insufficient to establish an essential element of the nonmoving party's claim." *Id.* at 1169 (citation and internal quotation marks omitted). Both methods are acceptable under the current rules. *Id.*

It is noteworthy that Bond is a pro se plaintiff. However, his pro se status does not relieve him from complying with the procedural rules associated with summary judgment. *See Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817-18 (7th Cir. 2004) (requiring pro se plaintiff to strictly comply with Northern District of Illinois Local Rule 56.1); *Anderson v. Hardman*, 241 F.3d 544, 545 (7th Cir. 2001) (explaining that pro se litigants must still comply with procedural rules).

Undisputed Facts

Bond is an African-American who was employed by the City of South Bend ("South Bend") from August 18, 1997 to July 24, 2013. South Bend owns and operates a wastewater treatment plant ("Wastewater"). (*See* Affidavit of Alvin Greek, hereinafter "Greek Aff.," ¶¶ 2, 3.) South Bend provides all its employees with a Rules

4

and Regulations Manual ("Manual"). (*Id.* at ¶ 14.) Among other things, the Manual establishes a discipline policy, which states that an employee is subject to discharge on his or her first offense for falsifying city records. (*Id.* at ¶¶ 16, 17.)

Bond worked in a variety of positions and departments for South Bend before he started working at Wastewater in 2005. (*Id.* at ¶ 11.) Nancy Clay became the Operations Supervisor at Wastewater in 2008 and was promoted to Operations Manager a few years later. (Affidavit of Nancy Clay, hereinafter "Clay Aff." at ¶ 3.) Bond received multiple reprimands for violating Wastewater rules, such as misuse of sick time and sleeping on the job while working for South Bend, and the disciplinary notices are attached as exhibits to Clay's affidavit. (Clay Aff. at ¶¶ 5, 6.) Clay stated in her affidavit that since she became Supervisor in 2008, she also received several reports of Bond reporting to work while intoxicated. (Clay Aff. at ¶ 7.)

As a result of the written reprimands, Bond was discharged from his employment at Wastewater on two separate occasions prior to his final termination in 2013. (*Id.* at ¶ 8; *see also* Greek Aff. at ¶ 13.) Yet, Bond returned to work on both occasions under a Final Letter of Warning, which allows a discharged employee to be reinstated under the terms of the letter. (Clay Aff. at ¶¶ 8, 9.) The final letter of warning, dated August 22, 2011, states that "[t]his letter will serve as official notice to you that you

5

are working under this Final Letter of Warning. This means that should any infractions of any work rule in place at Environmental Services Division of the City of South Bend, or policy or procedure violations of the Policies and Procedures of the City of South Bend will result in your immediate termination." (DE #54-1, p. 26.)

As the Operations Manager, Clay made all employment decisions for all operators, which included all hiring and discipline decisions. (Clay Aff. at ¶ 10.) Only one African-American, Calvin Watt ("Watt"), has applied for a general operator position since Clay became Operations Supervisor. (*Id.* at ¶ 12.) Clay eventually interviewed and hired Watt. (*Id.* at ¶ 11).

South Bend operates Wastewater under permits issued by the National Pollutant Discharge Elimination System ("NPDES"). The NPDES requires South Bend to obtain and record a valid sample of incoming water samples for each 24 hour period. (Greek Aff. at ¶ 18.) South Bend samples the waste water by using a refrigerated Automatic Sampler Unit (the "Sampler"). (*Id.* at ¶ 18.) On a daily basis, the operators are required to record the temperature and fluid level from the Sampler. (Clay Aff. at ¶ 24.) The recorded data from the Sampler is a very important function of Wastewater because the NPDES issues penalties for tampering with or falsifying data. (Greek Aff. at ¶ 19.) Under the NPDES permit, any person who falsifies, tampers with, or knowingly renders inaccurate data

6

may be fined up to $10,000 per violation and jailed for up to 180 days. (*Id.*) Under Clay's supervision at Wastewater, she has fired three operators for falsifying data. (Clay Aff. at ¶ 43.) The first operator that was fired by Clay was Jason Yavorsky, a white male who was terminated for falsifying data. (*Id.* at ¶ 42.)

Relying on recorded Sampler data, Alvin Greek ("Greek"), a certified operator for South Bend, was responsible for submitting monthly reports of operation to the state of Indiana. (Greek Aff. at ¶ 20.) While working for South Bend, Bond admits that he has never heard or seen any kind of racist jokes or comments being spoken by Alvin Greek or Nancy Clay. (Bond Dep., p. 101.)

Bond was terminated on July 24, 2013 after an internal investigation, conducted by Clay, concluded that Bond falsified data on South Bend documents during his shift on July 18, 2013. (Clay Aff. at ¶¶ 17, 19, 31, 32.) Bond was responsible during his shift to check and record the data collected by the Sampler. (*Id.* at ¶ 20.) Clay's internal investigation concluded that the data recorded by Bond at 8:10 p.m. on July 18, 2013, was fabricated. (*Id.* at ¶ 32.)[1] Clay's 2013 investigation concluded that Calvin

---

[1] Bond improperly disputes the allegations made in South Bend's motion for summary regarding the series of events that took place, speculating that South Bend's version is incorrect, but failing to designate admissible evidence to support his subjective beliefs. Fed. R. Civ. P. 56(c) establishes that a party asserting a fact is genuinely disputed must support the assertion by: citing to particular parts of materials in the record, including depositions, documents, affidavits, declarations, stipulations, admissions, interrogatory answers, or other materials. Fed. R. Civ. P. 56(c)(1)(A). Supported by admissible evidence in the record, South Bend provides the following:

Watt, another operator who is also African-American, also recorded falsified data from the Sampler. (*Id.* at ¶ 35.)

Bond and Watt were the only two employees to record the Sampler data on July 18, 2013 and July 19, 2013. (Clay Aff. at ¶ 35, 36.) Both Bond and Watt were terminated based upon the finding that they falsified data on the Sample log sheet. (*Id.* at ¶¶ 33, 35.) Bond and Watt both appealed their discharges in accordance with South Bend's contract with the local Teamster's Union, and both were heard before a Union Grievance Committee. (*Id.* at ¶¶ 34, 37.) The Union Grievance Committee upheld Bond's termination. (*Id.* at ¶ 34.) However, the Committee held that Watt should be reinstated and receive additional training because Watt admitted that he may have recorded data from the previous day's sample

---

"When Bond recorded the Sampler data at 8:10 p.m. on July 18, 2013, he stated that the bottles contained 3.0 L of sample and had an internal temperature of 3˚C. (Clay Aff. at ¶ 27). When Michelle Smith, the lead chemist, came to collect the samples on the morning of July 19 however, she found that the machine did not have any power and that there was only 1.9 L of sample inside both bottles. *Id.* at ¶ 28. She immediately informed Nancy Clay, who confirmed that there was only 1.9 L of sample in each bottle from July 18, and that the temperature inside the Sampler unit was far in excess of 3˚C. *Id.* Clay then conducted an investigation that determined that the Sampler had lost power sometime around 11:00 a.m. or 11:30 a.m. on July 18 and consequently could not have been refrigerated or produced a sample from that point forward. *Id.* at ¶ 31. Because the unrefrigerated Sampler had been sitting in 90˚ weather for approximately nine hours before Bond recorded his data on the 18th, and because the bottles contained only 1.9 L of sample the next morning, Clay concluded that Bond fabricated his report of 3˚C and 3 L of sample. *Id.* at ¶ 32.

(DE #51, pp. 7-8.) Although Bond disputes this version, and claims much of this evidence is hearsay, this version of the events is properly supported by Nancy Clay's affidavit, who has personal knowledge of the matters stated. Fed. R. Civ. P. 56(c)(4).

8

bottles by mistake. (*Id.* at ¶ 37.) In contrast to Watt, Bond maintains that he properly recorded the sample. (DE #54 at 10-13.) The Committee found that Watt "was still a relatively new employee at this point, so the committee ruled that his employment should be reinstated and that he should receive additional training so that he would not make the same mistake again." (Clay Aff. at ¶ 37.)

On September 16, 2014, Bond filed his employment discrimination complaint against South Bend. Bond alleges that because he was falsely accused and wrongfully terminated, South Bend is liable to him for discrimination based on his race, in violation of Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. §2000e-5. On September 14, 2015, South Bend filed its motion for summary judgment. South Bend argues that Bond was fired for falsifying data and that there is no direct or indirect evidence of employment discrimination based on race.

Discrimination Based on Race

Bond alleges race discrimination in violation of Title VII. Title VII provides that it is unlawful for an employer to "discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42

U.S.C. § 2000e–2(a)(1). "In a Title VII case a plaintiff may show discrimination under either the 'direct' or 'indirect' *methods* of proof." *Atanus v. Perry,* 520 F.3d 662, 671 (7th Cir. 2008) (citation omitted) (emphasis original).

It is undisputed that South Bend hired Bond, an African American, in 1997, and terminated his employment in 2013. Bond alleges that he was discharged because of his race but he does not indicate whether he wishes to proceed under the direct or indirect method in attempting to prove discrimination.

Under the direct proof method, "the plaintiff must present either direct or circumstantial evidence of discrimination in [his] . . . opposition to summary judgment." *Hutt v. AbbVie Prods. LLC*, 757 F.3d 687, 691 (7th Cir. 2014) (quoting *Bass v. Joliet Pub. Sch. Dist. No. 86*, 746 F.3d 835, 840 (7th Cir. 2014)). Direct evidence means "an admission of discriminatory intent, *i.e.* 'smoking gun' evidence." *Id.* (quoting *Alexander v. Casino Queen*, Inc., 739 F.3d 972, 979 (7th Cir. 2014)). Here, Bond has put forth no evidence whatsoever that any decision-maker stated that Bond was being terminated because of his race. Moreover, Bond does not claim that anyone associated with the City ever professed any discriminatory intent.

A plaintiff may also offer "direct proof" of discriminatory intent through circumstantial evidence. This is sometimes described as the plaintiff's burden to present "a convincing mosaic

10

of circumstantial evidence from which a factfinder can make a reasonable inference of discriminatory intent." *Hutt*, 757 F.3d at 691. Courts look for things like: "(1) suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group; (2) evidence . . . that similarly situated employees outside the protected class received systematically better treatment; and (3) evidence that the employee was qualified for the job in question but was passed over in favor of a person outside the protected class." *Id.*

The undisputed facts show that Bond has not presented a convincing mosaic of circumstantial evidence to find discriminatory intent. Bond claims it was suspicious timing:

> [T]hat Nancy Clay learned about the downsizing of the two (2) Operators Positions only one week and a half after the termination of the two Black Operators. It's also suspicious timing that the Sampler broke down right after Josh Sporleder (white) did his reading, its suspicious timing that the Sampler was broke only when John Bond and Clavin [sic.] Watt (Black) did their reading. It's suspicious timing that the Sampler was back up and running in time for Jeff Seiradzki (white) to get an accurate reading.

(DE #54 at 19.) However, Clay testified that she did not learn of the City's need to restructure its workforce at the plant until a week and a half after she conducted her investigation and made the decision to terminate Bond. (Clay Aff. ¶ 40.) The rest of Bond's argument about suspicious timing, claiming it is suspicious that

11

the Sampler was allegedly not working during his reading, but allegedly was functioning with a white employee, is entirely speculative and unsupported by any admissible evidence. This is insufficient to create a genuine issue of material fact. *See Mills v. First Fed. Sav. & Loan Assoc. of Belvidere*, 83 F.3d 833, 841-42 (7th Cir. 1996) ("subjective beliefs of the plaintiff are insufficient to create a genuine issue of material fact"); *Scheerer v. Potter*, 443 F.3d 916, 919 (7th Cir. 2006) ("[s]pecific facts are required; conclusory allegations will not do."); *see also Visser v. Packer Eng'g Assocs.*, 924 F.2d 655, 659 (7th Cir. 1991) ("Discrimination law would be unmanageable if disgruntled employees . . . could defeat summary judgment by . . . speculating about the defendant's motives. There would be no summary judgment in [] discrimination cases.").

Because Bond has failed to prove discrimination using the direct method, this Court turns to the indirect method next. The test for proving discrimination using the indirect method was first set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–03 (1973). A plaintiff may create a presumption of discrimination by establishing a prima facie case of discrimination. *Atanus,* 520 F.3d at 672. A prima facie case under Title VII can be shown by demonstrating that: (1) the plaintiff is a member of a protected class, (2) his job performance met his employer's legitimate expectations, (3) he suffered an adverse employment action, and

12

(4) another similarly situated individual who was not in the protected class was treated more favorably than the plaintiff. *Burks v. Wisconsin Dep't of Transp.,* 464 F.3d 744, 750–751 (7th Cir. 2006).

In this case, it is undisputed that Bond is a member of a protected class as he is an African-American, and it is undisputed that he was terminated. However, South Bend argues that Bond cannot satisfy the prima facie test because he fails the fourth element. Specifically, South Bend contends that there are no true comparators of similarly situated employees from outside the protected class because Bond and Watt were the only employees to record data during the time the Sampler was turned off. The Court concurs. "To create an inference of discriminatory intent, the indirect method requires the identification of similarly situated comparators because all things being equal, if an employer takes an action against one employee in a protected class but not another outside that class, one can infer discrimination; the similarly situated prong establishes whether all things are in fact equal." *Chaib v. Indiana*, 744 F.3d 974, 984 (7th Cir. 2014) (quotation omitted).

In this case, Watt is not a similarly situated comparator because he is in the same protected class as Bond. Indeed, the fact that Watt received the same termination as Bond, but then leniency was shown to Watt, a relatively new African American who

admitted he may have made a mistake, actually undercuts Bond's argument that he must have been terminated based upon his race. Although Bond argues there were other white employees who recorded data on July 18th and 19th, who were not implicated and attaches as Exhibit 6 a "raw sampler" log that contains certain initials (DE #54, p. 25), Clay specifically testified that "Bond and Watt were the only employees who recorded data during the time that the Sampler was off." (Clay Aff. at ¶ 36.) There is simply no admissible evidence showing that a similarly situated employee outside of Bond's protected class also incorrectly recorded data but was not terminated. Here, Bond has not shown that any non-African American was subject to different treatment than the treatment of which he complains. As a result, Bond's disparate treatment claims fail under the indirect method because no inference of discrimination arises.

Bond has failed his initial burden of establishing a prima facie case of discrimination and the Court may grant summary judgment on this basis alone. *See Paluck v. Gooding Rubber Co.*, 221 F.3d 1003, 1011 (7th Cir.2000) (finding where a plaintiff has "failed to make a prima facie case, [the Court] need not address" the question of whether the employer's stated reason for the termination was in fact a pretext for retaliatory motive); *see also Cowan v. Glenbrook Security Servs., Inc.*, 123 F.3d 438, 445 (7th Cir. 1997) ("We need not reach the issue of pretext, as

14

plaintiff has failed to state a prima facie case of discriminatory discharge under McDonnell Douglas."). However, even if Bond had succeeded in establishing a prima facie case of discrimination, the Court could also grant summary judgment on the ground that South Bend has articulated a legitimate, non-discriminatory reason for terminating Bond – Bond falsified data on the Sampler log.

The burden then shifts to Bond to demonstrate that the "nondiscriminatory" reason is not the real reason for termination, but instead a cover-up for discrimination. *Koski v. Standex Int'l Corp.*, 307 F.3d 672, 677 (7th Cir. 2002); *see also Pignato v. American Trans Air, Inc.*, 14 F.3d 342, 349 (7th Cir. 1994) (holding that to establish pretext, the plaintiff bears the burden of establishing that the given reason was a "phony reason"); *Anderson v. Baxter Healthcare Corp.*, 13 F.3d 1120, 1123-24 (7th Cir.1994) (plaintiff must provide evidence from which it could be inferred that "the [employer] lied about its proffered reasons" for his dismissal). "The fact that the employer was mistaken or based its decision on bad policy, or even just plain stupidity, goes nowhere as evidence that the proffered explanation is pretextual." *Essex v. United States Parcel Serv., Inc.*, 111 F.3d 1304, 1310 (7th Cir. 1997) (citations omitted).

Here, Bond has produced no evidence whatsoever of pretext. Bond asserts, without evidence, that Clay terminated Bond and Watt because she wanted to protect Caucasian workers from losing their

15

jobs during a time of restructuring. However, Watt was reinstated after his committee hearing where he admitted that he may have mistakenly recorded the Sampler data. Watt continued to work at Wastewater until early 2015. Bond cannot demonstrate that his termination was a pretext for discrimination because there is no reasonable inference that South Bend lied about its proffered reasons for terminating Bond.

In sum, Bond points to nothing suggesting that South Bend terminated him because of his race. Additionally, there is no evidence from which a reasonable trier of fact could conclude that South Bend's proffered reason for terminating Bond was pretextual. The fact that Watt (a member of the same protected class as Bond) was reinstated after he admitted to mistakenly recording the Sampler data, undercuts Bond's argument that he was fired based upon his race. Therefore, Bond's discrimination claims based upon race cannot survive summary judgment.

CONCLUSION

For the aforementioned reasons, the motion for summary judgment [DE #50] is **GRANTED**. The Clerk is **ORDERED** to **DISMISS** Plaintiff's Complaint **WITH PREJUDICE**.

**DATED:    March 23, 2016**          /s/ RUDY LOZANO, Judge
                                       **United States District Court**